## CONTINENTAL SOUTHLAND SAVINGS & LOAN ASS'N v. BUNYARD et ux.

### No. 8529.

Court of Civil Appeals of Texas. Austin.

July 21, 1937.

Rehearing Denied Oct. 4, 1937.

Wm. H. Flippen and Dan P. Johnston, both of Dallas, for plaintiff in error.

W. L. Scott, of Eden, and Upton, Upton, & Baker, of San Angelo, for defendants in error.

BAUGH, Justice.

Bunyard and wife, as plaintiffs below, brought this suit against the plaintiff in error, defendant below, and hereinafter designated as the Association, to have a note for $2,000, executed by them on December 5, 1926, for borrowed money, together with a deed of trust lien on their homestead in the city of San Angelo, given to secure it, declared void and canceled, on the ground that the loan was usurious; and in the alternative to have same reformed so as to evidence the alleged real agreement of the parties; and in the further alternative, if the plaintiffs be found not to have paid all their indebtedness to the Association, then that the court determine the balance due, and that they be permitted to pay such balance into court and have said note and lien canceled. Trial was to the court, and after hearing the evidence the trial court decreed that the contract between the Bunyards and the Association be reformed as prayed for, found that as reformed the note had been paid in full, canceled the lien against said property given to secure it, and awarded the property to the Bunyards free from such lien.

From this judgment the Association has appealed by writ of error.

The material facts are substantially as follows: Bunyard had in 1926 erected a home in San Angelo in part payment for which he executed a $2,000 note to his contractor, and a mechanic's lien on said property to secure it. One W. T. George, his bookkeeper, was at that time also the local agent for said Association. George induced Bunyard to apply to the Association for a loan to take up and extend said note and mechanic's lien. Said Association was a building and loan association organized and operating under the provisions of title 24, arts. 852 to 881, R.S.1925. Bunyard, in connection with said loan, executed the following instruments:

1. "Application for Loan" containing the following provisions: "I, or we, hereby make application for a loan of $2000, Two Thousand and no/100 Dollars, and subscribe for 30 shares of Class A Installment Stock of the Association, agreeing to accept both subject to its by-laws." This application also contained the provision that: "I, or we, agree to repay said loan in payments of $31.60 on the 5th day of each month, which I, or we, understand is a monthly payment of dues on the stock subscribed for and interest on the loan for which application is made."

2. "Application for membership to Continental Savings and Building Association, Dallas, Texas." The first sentence of this application reads: "I hereby apply for 30 shares of Class A Installment Stock of the above Association, and agree to accept same subject to its By-Laws. * * * Maturity value $3000.00 Monthly Payment of Dues $15.00 Membership Fee $45.00. * * *"

3. A written assignment to the Association of said 30 shares of stock, as collateral security for the $2000 note, with authority to sell same in case of default in the payment of such note.

4. The $2,000 note in question, due "at and when the 30 shares of Capital Stock, Class A Installment * * * shall reach a value equivalent to the face of the loan for which this note is given * * * with interest thereon from date until paid at the rate of ten per cent. per annum, etc."

5. Deed of trust on said property to secure the payment of said note according to its terms.

All of these instruments were executed as a part of the same transaction in procuring said loan. Bunyard was issued a pass book in which a record entry of all payments made by him were entered. This record shows that he paid, as he was authorized to do, in addition to the $31.60 per month, of which $16.60 was interest on his note and $15 payment on his stock in said Association, from May, 1927, to June, 1931, the further sum of $15 per month on his stock, with all of which he was duly credited. During this period he was also credited on his debt to the Association with semiannual dividends on his stock.

■ The contract involved, composed of the several instruments above indicated, was the uniform contract of the Association authorized by the building and loan statutes above cited, and have been upheld by the courts as valid. Wood v. Continental Saving & Building Ass'n (Tex. Com.App.) 56 S.W.(2d) 641; Hatcher v. Continental Southland Savings & Loan Ass'n, 124 Tex. 601, 80 S.W.(2d) 299; Marinick v. Continental Southland Savings & Loan Association (Tex.Civ.App.) 97 S.W.(2d) 480. The first attack by Bunyard on the contract is that it was usurious. This question, however, on the identical contract with the same Association, has been foreclosed against him in the above-cited cases.

■ Nor do any grounds appear upon which the trial court was authorized to reform the contract between Bunyard and the Association. It is unnecessary to discuss here the dual relationship of Bunyard to the Association. That is, his status as a borrower on the one hand; and, on the other, his status as a stockholder and part owner to that extent in the assets of the corporation from which he borrowed money. These matters are fully discussed by the Supreme Court in the Wood and Hatcher Cases, supra. Indeed, the Wood Case, involving the identical form of contract, and in which substantially the same contentions were made as are made here, is so nearly on all fours with this case, that it manifestly rules this case. We will, however, discuss the issues presented. It is true that the plaintiff alleged that at the time he executed the application for the loan, the agent George told him that no stock in the Association would be issued to him, and that the execution of these instruments were matters of form required by the Association; and, further, that George

assured him that his interest rate would not exceed 6 per cent. But Bunyard testified that no one prevented him from reading the instruments he signed, and that he did in fact read parts of same. We think it conclusively appears that he read both the application to purchase such stock, and the note agreeing to pay for it. He testified that because of their provisions he protested to George and told him that he did not want to purchase any stock; and the note expressly provided interest at the rate of 10 per cent., the principal to mature when the value of the shares of his stock so purchased became sufficient to discharge it. While the pleadings may have been sufficient to raise the issue of fraud, inducing Bunyard to execute said instruments, a careful reading of both his testimony and that of George clearly discloses, we think, that the statements of George as to the amount of interest he would be required to pay under such contract was merely his opinion, predicated upon the prior dividends of the Association, that such dividends on his stock, when applied to the payment of his note to the Association would not amount to an interest charge of more than 6 per cent., regardless of the rate specified in the note. This representation could not, under such circumstances, constitute fraud. The express provisions of the instruments signed by Bunyard, with the material provisions of which he was admittedly cognizant, as a matter of law preclude him from contradicting them on the ground that the agent George, who was his own bookkeeper, and his own agent in the premises also, misinterpreted the instruments to him. They are, and have been adjudicated to be, valid and binding contracts. Bunyard executed them voluntarily, and there is no evidence of any misstatement to him of any facts relative to their contents, nor that anything was done by George or by the Association to prevent him from fully ascertaining their provisions. They constituted, therefore, valid and binding obligations against Bunyard. The trial court could not, by reformation or otherwise, decree a contract other than that made by the parties themselves.

■ Nor does the contract appear to be ambiguous on its face. While no definite date of maturity was fixed in said note, this was due to the option given to the borrower to pay out his stock in greater sums per month than the $15 per month

prescribed as minimum payments thereon. The sooner he paid out his stock, the sooner, of course, would he pay off his note. But the due date thereof was readily determinable under the terms of his contract.

Manifestly, there was no mutual mistake as to the terms of said contract. Not only is mutual mistake, as a basis of reformation, not pleaded, but such mistake is not shown by the evidence. The Association in the instruments furnished by it to be executed by Bunyard manifestly never intended to make the contract alleged in plaintiff's petition. The only contract intended by it was its uniform contract authorized by the statutes controlling it, and the instruments prepared by it and furnished to Bunyard for execution were prepared in compliance with such statutes for that purpose. George, whose duty it was to procure the execution of these instruments, was not authorized to make a different contract. Consequently, the contract decreed by the court by way of reformation, to the effect that only a loan of $2,000 at 6 per cent. interest with no purchase of stock by Bunyard was made, was tantamount to making by the court of a contract never agreed upon by the parties themselves.

There is no contention that George intentionally or knowingly misrepresented the facts in connection with said loan to Bunyard. His misrepresentations, if such they were, were but his misinterpretation of the import of the instruments executed. And this misinterpretation was contrary to the express provisions of the written instruments themselves, the provisions of which were undoubtedly known to Bunyard, or at least with the knowledge of which provisions he was legally chargeable. Consequently, he could not, in legal contemplation, have been misled in the premises.

There is no contention that the mechanic's lien and note assigned to the Association, and which the loan here involved was made to pay, were invalid. The Association consequently became subrogated to such debt and lien. The deed of trust therefore secured Bunyard's debt to that extent, even on his homestead; and likewise the increase in the rate of interest in the new note over the rate provided in the mechanic's lien note. Gibraltar Savings &

Bldg. Ass'n v. Harper (Tex.Civ.App.) 41 S.W.(2d) 130 (writ ref.). Whether such lien secured the attorney's fees or not in the new note would depend upon whether the property in question constituted the homestead of the Bunyards at the time the mechanic's lien and note were executed. If it did, then the attorney's fees in said note would not be secured by such lien. 22 Tex.Jur., § 24, p. 324, and cases cited in support of the text therein. If the vacant lot, at the time the mechanic's lien and note were executed, did not constitute such homestead, then that lien did secure such attorney's fees also; and the attorney's fees provided in the new note would also be secured by the deed of trust. Summerville v. King, 98 Tex. 332, 83 S.W. 680; Id. (Tex.Sup.) 84 S.W. 643.

Among other relief sought, the plaintiffs prayed in the alternative that the amount of their debt still due to the Association be determined by the court, and that they be permitted to pay same into court and have their note and lien on said property discharged. This question, of course, still remains to be determined. The judgment of the trial court will, therefore, be reversed, and the cause remanded for another trial in accordance with this opinion.

Reversed and remanded.

### On Motion for Rehearing.

On motion for rehearing Bunyard insists, among other things, that the deed of trust in question attempted to create a lien on the homestead to secure payment for the stock subscribed for by him in said Association, contrary to the provisions of the Constitution (article 16, § 50) and homestead exemption statutes (Vernon's Ann.Civ.St. art. 3832 et seq.); that same was therefore void; and that if the provisions of the deed of trust relating to the stock subscription payments be eliminated, then that the contract became so indefinite and ambiguous as to be unenforceable.

We have again examined the deed of trust and find that the lien therein provided secured only the $2,000 note and not the stock subscription. True, it did provide that failure to pay either the interest on the note itself or the stock subscription as same matured would authorize foreclosure for the debt secured; but, so far as principal was concerned, that related only

to the $2,000 note. And since the maturity date of the note was referable to the time in which the stock was paid out, and the date of such maturity dependent upon the facility or delay in making such stock payments, we are not prepared to say that the method of enforcing prompt payments thereof in the manner provided constituted a burden on the homestead additional to the principal debt. It appears rather a concurrent method of requiring prompt payments of that debt, and remedial in nature only. If such provision in the deed of trust does, however, place a lien on the homestead for any additional sum, other than the increased interest rate, than the original debt for improvements thereon, it would, of course, be a void lien as to such additional burden upon the homestead. But this would not affect its validity as to the principal note and interest. The motion for rehearing will be overruled.

Overruled.